UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

      Plaintiff,

 -vs-                          Case No. 19-CR-136-JDP-6

JOHN GATES,                      Madison, Wisconsin
                                  December 22, 2020
         Defendant.           1:12 p.m.

---

STENOGRAPHIC TRANSCRIPT OF VIDEOCONFERENCE PLEA AND SENTENCING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

                Office of the United States Attorney
                BY:  DIANE L. SCHLIPPER
                Assistant United States Attorney
                222 West Washington Avenue, Suite 700
                Madison, Wisconsin  53703

For the Defendant:

                Murphy Desmond S.C.
                BY:  MARK P. MACIOLEK
                33 East Main Street, Suite 500
                P.O. Box 2038
                Madison, Wisconsin  53701-2038

Also appearing:   JOHN GATES, Defendant
                  JESSICA SHEETS, U.S. Probation Officer

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

```
 1              (Proceedings called to order at 1:12 p.m.)

 2              THE CLERK:  Case No. 19-CR-136, the United States of

 3    America v. John Gates, called for a plea and sentencing.

 4         May we have the appearances, please.

 5              MS. SCHLIPPER:  Diane Schlipper appearing on behalf of

 6    the United States.

 7              MR. MACIOLEK:  Good afternoon --

 8              THE COURT:  Good afternoon.

 9              MR. MACIOLEK:  -- Your Honor.  Good afternoon, Your

10    Honor.  I apologize.  Mark Maciolek for John Gates, and Mr.

11    Gates is joining us from the Dane County Jail via

12    videoconferencing.  I'd note for the record that Mr. Gates and I

13    are not in the same physical location.

14              THE COURT:  All right.  Very good.  Good afternoon to

15    both of you.

16         Jessica Sheets is here with us as well.  She's the

17    probation officer who prepared the presentence report.

18         And we're proceeding by video teleconferencing with a

19    combined plea and sentencing.  I believe that Mr. Gates has

20    already submitted a written consent to proceed this way, but

21    let's put it on the record here.  We're proceeding by video

22    teleconference.  I've determined for the Court that it's not

23    safe to proceed in person without exposing undue -- the case

24    participants to undue risks, but I think the interests of

25    justice compel us to move forward with this case, but we can do
```

1    it this way only if Mr. Gates consents to it.

2         So, Mr. Gates, do you understand that you've got the right

3    to appear before me in person for your plea and your sentencing?

4              THE DEFENDANT:  Yes, I do.

5              THE COURT:  And you're willing to waive your personal

6    appearance and proceed by videoconference?

7              THE DEFENDANT:  Yes.

8              THE COURT:  That's how we'll do it then.

9         So, Mr. Maciolek, have you and Mr. Gates received a copy of

10   the indictment?

11             MR. MACIOLEK:  Yes, Your Honor, we have received a copy

12   of the indictment.  We would waive its formal reading.

13             THE COURT:  Very good.

14        I'll ask Ms. Schlipper to state the penalties that Mr.

15   Gates could face if he were convicted.

16             MS. SCHLIPPER:  Certainly, Your Honor.  My

17   understanding is Mr. Gates will enter a plea to Count 28

18   charging a violation of Title 21, United States Code, Section

19   846.  The maximum penalties, excuse me, are 20 years in prison,

20   a fine of up to $1 million, a period of supervised release of at

21   least three years and up to a lifetime, and then there is the

22   $100 special assessment, which is mandatory.

23             THE COURT:  Thank you.

24        Mr. Maciolek, have you talked with Mr. Gates about the

25   charges he faces, the penalties that could result, and whether

1    he has any defenses?

2              MR. MACIOLEK:  Yes, Your Honor.

3              THE COURT:  Mr. Gates, my understanding is you want to

4    enter a plea of guilty today; is that right?

5              THE DEFENDANT:  Yes.

6              THE COURT:  The purpose of this part of the hearing is

7    to make sure that you're capable of proceeding, that your plea

8    is truly voluntary, that you understand the charges you face and

9    the penalties that could result.  I also have to make sure

10   there's a factual basis for the plea, which means there's reason

11   for me to believe that you're actually guilty before I accept a

12   plea of guilty.  I also need to review the rights that you will

13   give up if you choose to please guilty, so I have to ask you

14   some questions that you have to answer under oath.  So I'm going

15   to ask you to raise your right hand, and the clerk is going to

16   swear you to tell the truth.

17                   **JOHN GATES, DEFENDANT, SWORN**

18             THE COURT:  I need to make sure you understand now that

19   you've sworn to tell the truth, if you knowingly give any false

20   answers to my questions, you could be prosecuted for perjury.

21   Do you understand that?

22             THE DEFENDANT:  Yes.

23             THE COURT:  My first questions are to make sure that

24   you're capable of proceeding today.

25        Tell me how old you are.

1          THE DEFENDANT:  51.

2          THE COURT:  51.  And tell me, how much formal education

3    have you had?

4          THE DEFENDANT:  HSED.

5          THE COURT:  All right.  You signed a plea agreement

6    that was several pages long.  Were you able to read it and

7    understand it before you signed it?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Let's find out if there's anything that

10   would affect your decision-making or your understanding today.

11       Do you suffer from any physical or mental illness?

12          THE DEFENDANT:  (Inaudible.)

13          THE COURT:  I'm sorry.  I didn't hear you.  You might

14   have to speak up just a little bit louder.

15          THE DEFENDANT:  No.

16          THE COURT:  Do you take any medication?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Tell me what you take.

19          THE DEFENDANT:  High blood pressure, and also I take --

20          THE COURT:  Okay.

21          THE DEFENDANT:  -- fluoxetine for depression.

22          THE COURT:  All right.  And so do you feel that your

23   underlying conditions, either your high blood pressure or your

24   depression, interferes with your ability to understand what's

25   going on around you or your ability to make a good decision

```
 1    about an important matter?
 2              THE DEFENDANT:  No.
 3              THE COURT:  And how about the medication you take?
 4    Does it have any effect on your mental abilities?  Does it make
 5    you foggy or interfere with your ability to understand what's
 6    going on around or your ability to make decisions?
 7              THE DEFENDANT:  No.
 8              THE COURT:  All right.  So while this is a drug crime
 9    and it looks like you have some substance issues, let's just put
10    that on the record too.  Do you feel that you're addicted to
11    drugs or alcohol?
12              THE DEFENDANT:  I have a problem with it, yes.  I don't
13    know about addiction.
14              THE COURT:  All right.  Okay.  And so let's be clear
15    about this:  Are you under the influence of any illegal drugs or
16    alcohol right now?
17              THE DEFENDANT:  No.
18              THE COURT:  How long have you been sober?
19              THE DEFENDANT:  18 months.  I've been incarcerated the
20    past 18 months.
21              THE COURT:  All right.  And do you feel like your
22    substance dependencies have any current effect on your ability
23    to understand what's going on around or your ability to make
24    decisions?
25              THE DEFENDANT:  No.
```

1          THE COURT:  All right.  Is there any other reason that

2     you wouldn't be able to follow what we're doing today and make a

3     good decision about whether to plead guilty?

4          THE DEFENDANT:  No.

5          THE COURT:  Mr. Gates, have you talked with Mr.

6     Maciolek about the nature of the charges that you face?

7          THE DEFENDANT:  Yes, I have.

8          THE COURT:  Have you talked about the facts the

9     government thinks it could prove if the case went to trial?

10         THE DEFENDANT:  Yeah.  Yes, we have.

11         THE COURT:  And have you talked about whether you have

12     any defenses to the charges?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Have you talked about the sentencing

15     guidelines and how the United States Sentencing Guidelines might

16     affect the sentence you'll receive?

17         THE DEFENDANT:  Briefly, yes.

18         THE COURT:  All right.  Tell me in your own words what

19     you think you're being charged with.

20         THE DEFENDANT:  Attempting to purchase methamphetamine

21     with the intent to distribute.

22         THE COURT:  All right.  And you understand that you're

23     being charged with it as part of a conspiracy?

24         THE DEFENDANT:  I thought the conspiracy wasn't part of

25     the plea, but I realize I was --

1          THE COURT:  Well, let me clarify that.  What count are

2     we pleading -- is Mr. Gates preparing to plead guilty to, Ms.

3     Schlipper?

4          MS. SCHLIPPER:  Count 28, exactly as he stated it.

5          THE COURT:  Okay.  Very good.  All right.  My

6     apologies.  My mistake.  The other defendants pled to the

7     conspiracy charge.

8          All right.  So you understand if I accept your plea and

9     find you guilty, you could be subject to up to 20 years in

10    prison?  Do you understand that?

11         THE DEFENDANT:  Yes.

12         THE COURT:  I could impose a fine of up to a million

13    dollars.  Do you understand that?

14         THE DEFENDANT:  Yes.

15         THE COURT:  And you understand that I will have to

16    impose the mandatory criminal assessment penalty of $100?  Do

17    you understand that?

18         THE DEFENDANT:  Yes.

19         THE COURT:  And any period of incarceration would be

20    followed by a period of supervised release that has to be at

21    least three years and could be the rest of your life.  Do you

22    understand that?

23         THE DEFENDANT:  Yes.

24         THE COURT:  And do you understand how supervised

25    release works?

1          THE DEFENDANT:  Not really.  I'm assuming it's a lot
2    like probation.
3          THE COURT:  It is.  So I would impose certain
4    conditions and restrictions on you, and you'd have to report in
5    to a supervising officer, and if you were to violate any of the
6    conditions or restrictions, I could revoke your supervised
7    release and send you to prison for violating the conditions.  Do
8    you understand that?
9          THE DEFENDANT:  Yes.
10          THE COURT:  All right.  So let's talk about the
11    sentencing guidelines.  So this is a combined plea and
12    sentencing hearing, so we've already gone through a lot of the
13    process of preparing the presentence report and working through
14    the guidelines.  So a lot of this should be familiar to you, but
15    there's a couple important points I want to make.
16       First of all, in calculating the guidelines, calculating
17    the sentence range that's recommended under the guidelines, I
18    want to make sure that you understand that we will consider
19    conduct that is not just the charge that is in the count of the
20    indictment that you're pleading guilty to.  We'll look more
21    broadly at your criminal conduct.  Do you understand that?
22          THE DEFENDANT:  Yes.
23          THE COURT:  All right.  And in a case like this, a drug
24    case particularly, the guidelines will try to derive an estimate
25    of the drug quantity that you were involved with.  Do you

1    understand that?

2            THE DEFENDANT:  Yes.

3            THE COURT:  All right.  Other factors are figured into

4    the guidelines, but I want -- and you've seen how they're

5    calculated.  So your role in the offense gets considered.  Your

6    criminal record gets considered.  Do you understand all that?

7            THE DEFENDANT:  Yes.

8            THE COURT:  And you understand that the fact that

9    you've decided to plead guilty, that would be a factor that

10    would count in your favor under the guidelines.  Do you

11    understand that?

12            THE DEFENDANT:  Yes.

13            THE COURT:  And I want to make sure you understand that

14    the general perspective of the guidelines is to consider a broad

15    range of factors about you and your background and your crime

16    and how it was committed and its impact on any victims or

17    society as a whole.  Do you understand that perspective?

18            THE DEFENDANT:  Yes.

19            THE COURT:  And, again, we've gone through the process,

20    so I think you're familiar with it, but there's a couple of

21    points I want to make.

22        The most important one is that you have the right to make

23    objections to the report if you disagree with it, and so I want

24    to make sure that you have reviewed the presentence report and

25    gone over it carefully with your attorney.  Have you done that?

1          THE DEFENDANT:  Not -- probably not quite as well as I
2     would like, but we have gone over it.
3          THE COURT:  Okay.  If you're comfortable with it --
4          THE DEFENDANT:  We went over it thoroughly.  I'm
5     just -- I still have concerns about it, I guess.
6          THE COURT:  All right.  And I have a couple of
7     objections that are pending that I'll have to discuss and rule
8     on those, but I want to make sure if you -- do you have any
9     objections other than the ones that Mr. Maciolek has raised with
10    me?  Has he raised all of your concerns to me?
11         THE DEFENDANT:  I'm not sure what all ones he's raised.
12    I have concerns with the weight.
13         THE COURT:  He has raised that issue with the weight
14    with me.
15         THE DEFENDANT:  And also with my criminal history
16    points because this all fell in the time frame of the
17    investigation, all relevant conduct.
18         THE COURT:  And he has also raised that objection to
19    me.
20         THE DEFENDANT:  Okay.  Those are the ones.  I wasn't
21    sure if he had.
22         THE COURT:  Okay.  Very good.  So what I'm trying -- I
23    want to make sure that you get the chance -- that you know that
24    you have the right to make objections, and I wanted to know if
25    you had any objections other than the ones that Mr. Maciolek has

1    already brought to my attention, and he has brought those two

2    issues.  So anything else?

3              THE DEFENDANT:  I don't believe so, no.

4              THE COURT:  All right.  Very good.

5         All right.  So in the sentencing portion of the hearing

6    today, I will rule on the objections that I have, and then I'll

7    make a final decision about what the final correctly calculated

8    guideline range should be and what should go in your report.

9    And here's the most important thing to take away from our

10   discussion of the guidelines:  I'll consider them, but they're

11   only advisory, so I don't have to follow them strictly.  So I

12   could sentence you above the guidelines or below the guidelines

13   if I think that's appropriate after I consider everything that

14   the guidelines tell me I should consider.  Do you understand

15   that the guidelines are only advisory?

16             THE DEFENDANT:  Yes.

17             THE COURT:  All right.  By pleading guilty today,

18   you'll give up some constitutional rights that you have as a

19   person who has been accused of a crime, and I want to review

20   some of those rights with you.

21        Do you understand that you've got the right to go to a

22   trial and have a jury decide if you're guilty?

23             THE DEFENDANT:  Yes.

24             THE COURT:  And you know the jury would have 12 people

25   on it, and you could be convicted only if all 12 of those jurors

1    found unanimously that you were guilty beyond a reasonable

2    doubt.  Do you understand that?

3              THE DEFENDANT:  Yes.

4              THE COURT:  And you know you and Mr. Maciolek would

5    help select the people who would serve on the jury.  Do you

6    understand that?

7              THE DEFENDANT:  (Inaudible).

8              THE COURT:  I didn't get your answer.

9              THE DEFENDANT:  Yes.

10             THE COURT:  Okay.  Under the Constitution of the United

11   States, no one can be forced to admit that they have committed a

12   crime, and that means that you don't have to plead guilty.  You

13   could stick with a plea of not guilty.  Do you understand that?

14             THE DEFENDANT:  Yes.

15             THE COURT:  It also means that if the case went to

16   trial, you would not have to testify, and I would tell the jury

17   that they couldn't hold that against you in any way.  Do you

18   understand that?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Now, you wouldn't have to testify, but if

21   you wanted to testify, you would have the right to do that if

22   that were your choice.  Do you understand you'd have the right

23   to testify if you wanted to?

24             THE DEFENDANT:  Yes.

25             THE COURT:  You'd also have the right to do what we

1    call confront and cross-examine the government's witnesses, and

2    that means you could confront them by facing them in the

3    courtroom.  You could cross-examine them by having your lawyer

4    ask them questions.  Do you understand you'd have those rights?

5            THE DEFENDANT:  Yes.

6            THE COURT:  You'd also have the right to call your own

7    witnesses, and even if they didn't want to come to court to

8    testify, you could compel them to testify by using a subpoena.

9    Do you understand you've got the right to call and compel the

10   attendance of witnesses?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Okay.  A felony offense affects your civil

13   rights outside the scope of this proceeding, and I want to touch

14   on some of the ways that could happen.

15       First of all, I want to make sure you know that after

16   you've been convicted of a felony, you may not have the right to

17   vote, the right to serve on a jury, or the right to hold public

18   office.  Do you understand that?

19           THE DEFENDANT:  Yes.

20           THE COURT:  And once you've been convicted of a felony,

21   you'd be permanently deprived of the right to possess any kind

22   of firearm or even ammunition for a firearm.  Do you understand

23   that?

24           THE DEFENDANT:  Yes.

25           THE COURT:  And if you did possess a firearm or

1    ammunition for one, you could be charged with a new crime for

2    that.  Do you understand that?

3         THE DEFENDANT:  Yes.

4         THE COURT:  If you're not a United States citizen, a

5    felony conviction can affect your residency or your immigration

6    status, and it can result in additional immigration-related

7    penalties, including possibly deportation from the United

8    States.  Do you understand that?

9         THE DEFENDANT:  Yes.

10        THE COURT:  Last point about your rights is I want to

11   make sure that you understand that you have a right to an

12   attorney, and that includes an attorney appointed at government

13   expense if you can't afford one.  Do you understand that?

14        THE DEFENDANT:  Yes.

15        THE COURT:  All right.  And so -- let's see.  I need

16   to -- give me one second here.  I want to put on the record the

17   docket number of the plea agreement here.

18        MR. MACIOLEK:  I believe it's 160, Your Honor.

19        THE COURT:  160.  All right.  Thank you.

20      And, Mr. Gates, did you sign the plea agreement?

21        THE DEFENDANT:  Yes, I did.

22        THE COURT:  Okay.  And does that reflect your agreement

23   with the government about your plea?

24        THE DEFENDANT:  Yes.

25        THE COURT:  Okay.  Ms. Schlipper, I'll ask you, does

1    that document reflect your agreement with Mr. Gates about his

2    plea?

3            MS. SCHLIPPER:  Yes, Your Honor.

4            THE COURT:  Okay.  And, Mr. Maciolek, you're the last

5    one.  Do you agree that that document reflects your agreement

6    with the government about Mr. Gates' plea?

7            MR. MACIOLEK:  It does, Your Honor.

8            THE COURT:  All right.  Mr. Gates, did anyone make any

9    other promises other than what's in the plea agreement?  Did

10   anyone make any other promises to get you to plead guilty?

11           THE DEFENDANT:  No.

12           THE COURT:  Did anyone threaten you or try to force you

13   to plead guilty?

14           THE DEFENDANT:  No.

15           THE COURT:  Did anyone tell you that you're going to

16   get some particular sentence in this case?

17           THE DEFENDANT:  No.

18           THE COURT:  And you know that the sentencing decision

19   will be up to me?  You understand that?

20           THE DEFENDANT:  Yes.

21           THE COURT:  So I'll consider any arguments or

22   recommendation that your lawyer makes or any arguments or

23   recommendation that the government makes, and I'll consider the

24   guidelines, but I don't have to follow any of that, and even if

25   I choose not to follow any of that, that does not give you the

1    right to withdraw your plea of guilty.  Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  All right.  Our next task is to determine

4    whether there's a factual basis for the plea, and, Ms.

5    Schlipper, I'll just ask you just to review very succinctly what

6    the factual basis is here for the count against Mr. Gates.

7          MS. SCHLIPPER:  Certainly, Your Honor.

8        Had this case gone to trial, the United States would have

9    presented the following evidence:

10       Agents would testify that they had a wiretap on Lisa

11   Xiong's telephone and were conducting surveillance

12   simultaneously.  The wiretap and surveillance evidence would

13   reveal that, in the days leading up to the June 13th traffic

14   stop involving Lisa Xiong and Chong Moua, that Lisa Xiong was in

15   Minnesota with her methamphetamine source.  She texted the

16   defendant that she's with the "big boss" and really needed Mr.

17   Gates to send her money, said she needed "a stack" or a thousand

18   dollars to move to the next level.  She continued to reach out

19   to the defendant trying to get him to commit to giving her

20   money.

21       The following day Lisa told Mr. Gates that she was coming

22   and that she had something big, a "whole one" or a "big one,"

23   that she was hopeful that the defendant would have people lined

24   up.  The defendant responded that he did have people -- or

25   that -- his language, that he had, excuse me, "shit lined up,"

1    and then Ms. Xiong told her source that she has people who are

2    waiting and prepared with money.  And then the defendant asks

3    Lisa Xiong for an arrival time and wanted to know if she was

4    coming to his house first, and she said she would be going to

5    his house and that she has a surprise.  And then on June 13th

6    she told the defendant she was in Wisconsin and she would need

7    some sort of cash from the defendant right away.  Then several

8    hours after telling the defendant they were heading towards him,

9    Lisa Xiong and Chong Moua were stopped in Wisconsin with

10    approximately 443 grams of methamphetamine.

11        Agents positively ID'd the defendant based on surveillance

12    footage, and he resides in Hewitt, Wisconsin, and both that and

13    his shop are in Marathon County, and agents would testify that

14    contributing or promising to contribute a thousand dollars or

15    more and potentially going in on a portion of a pound of

16    methamphetamine combined with the language that people were

17    "lined up" are all consistent with distributing methamphetamine.

18    Lab analysts would testify that the substances in this case

19    were, indeed, methamphetamine, and we would ask that the Court

20    take judicial notice that methamphetamine is a Schedule II

21    controlled substance, and both Hewitt and Marathon County are in

22    the Western District.  Thank you.

23        THE COURT:  All right.  Very good.

24        And, Mr. Maciolek, I'll start with you:  Can the government

25    prove these things?

```
 1            MR. MACIOLEK:  Yes, Your Honor.
 2            THE COURT:  And, Mr. Gates, I'll ask you the same
 3     thing:  Can the government prove those things?
 4            THE DEFENDANT:  Yes.
 5            THE COURT:  So, Mr. Gates, during the sentencing
 6     portion of our hearing, I will give you the opportunity to ask
 7     any -- or tell me anything that you think I should know before I
 8     decide what your sentence should be, but at this point of the
 9     hearing, I just need to hear in your own words what you did that
10     leads to your being charged and considering pleading guilty to
11     the charge in Count 28 of the indictment.
12            THE DEFENDANT:  You want to hear what I did; is that
13     right?
14            THE COURT:  Yeah, just in very brief, just to make sure
15     that all of the elements of the crime are satisfied, that you
16     knew what you were doing.
17            THE DEFENDANT:  Yeah.  I was attempting to purchase
18     methamphetamine for myself and friends.  I knew that it was
19     illegal to purchase meth.
20            THE COURT:  Okay.  And your plan was that some of the
21     methamphetamine would be distributed to others?
22            THE DEFENDANT:  With others.  Not so much through
23     others.
24            THE COURT:  Okay.  All right.  But it wasn't all for
25     your own use.
```

1          THE DEFENDANT:  No, it was not all for myself.

2          THE COURT:  Okay.  All right.

3      Ms. Schlipper, is there anything else you think I need to

4  review with Mr. Gates before I ask for his plea?

5          MS. SCHLIPPER:  No, Your Honor.  I think that's fine.

6          THE COURT:  All right.  Then, Mr. Gates, I'll ask you,

7  what is your plea to Count 28 of the indictment?

8          THE DEFENDANT:  Guilty.

9          THE COURT:  All right.  On the basis of this discussion

10  with you and your lawyer and on the basis of the record in the

11  case as a whole, I'll find you entered a plea of guilty

12  knowingly and voluntarily, that you had an adequate opportunity

13  to consult with counsel, and that you understand both the nature

14  of the charges and the consequences of a plea of guilty.  I'm

15  also satisfied that there's a factual basis for the plea.

16  Accordingly, I find you guilty of the charge contained in Count

17  28 of the indictment, and I'll accept the plea agreement.  I've

18  reviewed the presentence report.

19      So at this point then we can move to the sentencing portion

20  of the hearing, and I'll begin with just doing a rundown of the

21  materials that I've reviewed to make sure I didn't miss

22  anything.  So I've got the presentence report.  I think I've got

23  objections from both sides to the presentence report.  I've got

24  an addendum to the presentence report and a revised presentence

25  report.  Then I have a sentencing memo from each side.  Let's

1    find out if I missed anything.

2         Ms. Schlipper, was there anything else I should have looked

3    at from your side?

4              MS. SCHLIPPER:  No, Your Honor.  Thank you.

5              THE COURT:  Mr. Maciolek, did I get everything on your

6    side?

7              MR. MACIOLEK:  Yes, Your Honor.

8              THE COURT:  All right.  Very good.

9         Okay.  I'll adopt the facts in the presentence report as

10   the facts on which I will base my sentence.

11        We'll talk about the objections that we have here.  I'm

12   going to overrule the objection on the drug weight, although I

13   think it's appropriate to consider Mr. Maciolek's objection also

14   in the context of his sentencing argument, but I believe that

15   for purposes of guideline calculation, it's appropriate to

16   consider the relevant conduct, which includes activities that

17   were foreseeable to Mr. Gates as done by his co-conspirators.

18   And so even though Mr. Gates was only interested in acquiring a

19   quarter pound of the methamphetamine that Lisa Xiong was

20   attempting to purchase and bring back from Minnesota, it was

21   clearly foreseeable.  In fact, I think he specifically knew that

22   she was going out to get a pound of methamphetamine.  So, again,

23   it's appropriate to consider his role as part of the sentencing

24   argument, but for purposes of relevant conduct and for purposes

25   of guideline calculation, the larger drug quantity was clearly

1     foreseeable to Mr. Gates as the activity of the conspiracy.

2          Then we've also got the objection on the criminal history

3     points.  I think the addendum has it about right.  The

4     government also explained this accurately in its memorandum, and

5     the criminal history points were acquired, broadly speaking,

6     during the time of the conspiracy, but they really weren't part

7     of the conspiracy.  Those convictions did involve

8     methamphetamine, so there is that point of similarity with the

9     activities of the conspiracy, but that similarity really ends

10    there.  Those were individual possession convictions, they

11    didn't involve the same participants, and fundamentally it

12    really isn't the same activity as acquiring and distributing

13    quantities of methamphetamine, which were the activities of the

14    conspiracy.  So I find that the criminal history is also

15    correctly calculated in the presentence report as well, so I'll

16    overrule those objections as well.

17         And, again, it's still fair game to talk about Mr. Gates'

18    criminal history as a sentencing argument, and I'll also tell

19    you this: that in cases like this where there is a fairly

20    substantial drug quantity, I find sometimes that the drug

21    quantity is not such a good proxy of the defendant's culpability

22    and that this is a case in which I will be looking less to the

23    guidelines and more to the sentencing factors in Section 3553(a)

24    to come up with a just sentence, although we'll talk more about

25    that.

1    So with my overruling the two objections on the presentence

2    report, I think that we have ended up then with a -- well, let

3    me confirm too that the government is still prepared to move for

4    the three-level -- the third level of downward adjustment for

5    acceptance of responsibility?

6        MS. SCHLIPPER:  So moved, Your Honor.

7        THE COURT:  Okay.  I expected that, and so that means

8    that we've got -- with three levels of downward adjustment then,

9    we end up with a total offense level of 27, criminal history is

10   category III, so that the defendant has an advisory guideline

11   imprisonment range of 87 to 108 months.

12       Ms. Schlipper, do you agree with that?

13       MS. SCHLIPPER:  Yes, Your Honor.

14       THE COURT:  And, Mr. Maciolek, do you agree with that?

15   I know I've overruled your objections, but in light of my

16   rulings, do you agree with the guideline calculation?

17       MR. MACIOLEK:  Yes, sir.

18       THE COURT:  Okay.  So that's as far as the guidelines

19   take us.  So let's find out what sentence I should actually

20   impose, and I thank you both for your sentencing memoranda, but

21   let's find out if there's anything else that you want me to

22   consider.

23       I'll start with Ms. Schlipper.

24       MS. SCHLIPPER:  Your Honor, everything I have to say is

25   primarily in the memo.  I just -- when I was thinking about Mr.

1    Maciolek and the defendant's recommendation and sort of where

2    the government's position is that this defendant falls relative

3    to the co-defendants in this case, and it seems as though with

4    his history and characteristics and the offense conduct, the

5    government's position is that his -- he sort of fits somewhere

6    in between -- it's not all that helpful -- but between Mr. Meng

7    Xiong and Soua Khang, somewhere in the guidelines based on

8    primarily the offense conduct.  So thank you.

9         THE COURT:  And if you would, remind me what the

10   sentences were imposed on Meng Xiong and Soua Khang.

11        MS. SCHLIPPER:  I believe Meng Xiong was five years,

12   and Ms. Khang was seven years.

13        THE COURT:  Okay.

14     All right.  Mr. Maciolek, anything else?

15        MR. MACIOLEK:  I think Ms. Schlipper's comments kind of

16   underscore our disagreement about how we view the case

17   respectively.  John acknowledges that he was part of -- you

18   know, part of distributing methamphetamine, but the quantities

19   he was using with the frequency of his use, that that was the

20   way he could support his habit without -- I guess without other

21   criminal activity like robberies or something awful like that,

22   which he has no history of committing.

23        So, you know, the other -- I certainly don't benefit, like

24   the government does, from seeing all the PSRs, so I don't know

25   what the relative criminal history or the other criminal conduct

1    of co-defendants is, but I would say that from what I do know

2    from the indictment and the discovery and the descriptions of

3    the other co-defendants in the presentence report and revised

4    presentence report that I did receive, Meng Xiong, Soua Khang

5    are -- and others are, you know, much more actively out in the

6    community finding people to sell to, selling to CIs, you know,

7    trying to kind of jockey for position in this organization.  I

8    believe especially Soua Khang was -- you know, I think there's

9    information that she was going around Lisa to try to get to the,

10   you know, Lisa's "gangster" as she put it, you know, in

11   Minnesota, so, you know -- and I think -- and this is --

12          THE COURT:  You're clearly right about that.  Soua

13   Khang was kind of Lisa Xiong's right-hand person.  So obviously

14   there are the mitigating circumstances of personal background,

15   of course, that are in those presentence reports that aren't

16   available to you, and I understand that, and that factors into

17   every sentencing.  But in terms of the criminal conduct here and

18   their involvement in the conspiracy, Mr. Gates is subordinate to

19   Soua Khang, absolutely.

20          MR. MACIOLEK:  And, you know, and I would even say

21   that, you know, he's -- I guess John enjoyed the position of

22   being the contact, the point of contact with Lisa, so that made

23   him, you know, I guess more indispensable for the people that he

24   was cooperating with.  And I did attempt to see if any of them

25   would come forward and confirm this, but, unsurprisingly, I did

1    not get any response or any volunteers, which I think is more

2    than understandable.

3        So, you know, I don't -- John is -- has not had a long

4    history of criminal activity.  It's not as though he graduated

5    to, you know, a higher level of drug dealing, as we often see

6    in federal cases where someone has years and years of, you know,

7    sort of accelerating and escalating conduct.  It appears to me

8    that his activity in this case is primarily driven by his

9    substance use disorder that has yet to be effectively addressed,

10   partly probably due to the difficult nature of addressing those

11   issues in any instance, probably partly due somewhat to his

12   constitution, and, frankly, partly due to his, you know, not

13   putting every effort that he could in yet, though at his age I

14   think he understands and has had a long time to be in jail and

15   think about these things.  And I think if he were a bigger

16   player, a more significant, you know, part of methamphetamine

17   distribution in Hewitt or in Marathon County in a larger sense,

18   that he would have come to the attention of authorities just as

19   so many of the co-conspirators did based on their more active

20   efforts to be part of something.

21       Finally, you know, while I certainly respect the Court's

22   ruling as far as the guideline objections, Mr. Gates was revoked

23   from supervision in the wake of the indictment and sentenced to

24   I think it was that 18-month sentence after revocation.  He's

25   now finally served all that, all that time, but it's otherwise

1    time that would have been credited to him as his pretrial

2    custody, and I think, you know, certainly to the extent that the

3    federal accusation was part of the basis for the revocation,

4    which it certainly was, that that -- the Court should consider

5    that as -- in crafting a final sentence.

6        And then his pending -- he had a pending charge in Wood

7    County where a criminal complaint has been filed, and it's

8    again, you know, methamphetamine possession within or very close

9    to the time period actually charged in this conspiracy, you

10   know, counts in the indictment.  So it's -- you know, if these

11   were all in front of Your Honor, they would all be grouped for

12   purposes of sentencing certainly, and it's, frankly, unlikely

13   that the government would even desire for them to be all, you

14   know, all part of the plea agreement.  Most of them would

15   probably be dismissed, as they are under the agreement --

16       THE COURT:  The presentence report indicates that there

17   are no pending charges.

18       MR. MACIOLEK:  Well, then I apologize for missing that

19   because there are.  There's a pending felony methamphetamine

20   possession charge in Wood County, and I will supply the Court in

21   a moment with the case number.

22       THE COURT:  Ms. Sheets might already be on it.  So, Ms.

23   Sheets, is there a pending charge still?

24       OFFICER SHEETS:  Your Honor, I'm looking that up right

25   now.

1          MR. MACIOLEK:  It is Wood County Case No. 20-CF-331

2   charging possession of methamphetamine, possession of psilocybin

3   mushrooms and drug paraphernalia.

4          OFFICER SHEETS:  Your Honor, it does look like that is

5   still pending.

6          THE COURT:  Okay.  So that's pending, and that's not

7   related to the activity of the Xiong organization; is that

8   right?  Or is that --

9          OFFICER SHEETS:  Your Honor --

10          THE COURT:  Go ahead, Ms. Sheets.

11          OFFICER SHEETS:  The listed offense date --

12          THE COURT:  Go ahead.

13          OFFICER SHEETS:  The listed offense date is July 11th,

14   2019.

15          THE COURT:  Okay.

16          MR. MACIOLEK:  So it's a little less than a month after

17   Lisa Xiong gets arrested and, you know, her role, of course,

18   ends.  So, you know, these are not, you know, drug dealing

19   charges.  They're possession charges, but, you know, they're

20   close in time.  I don't know if Mr. Gates has a -- I doubt he

21   accounted for his methamphetamine in a systematic and robust

22   way, but, you know, it's certainly -- at the very least, it's

23   certainly part of his continuing struggle with the substance use

24   disorder.  So whether it figures in under the guidelines,

25   perhaps not, and the Court's already addressed that, so I'd

1    expect that to be the ruling if it was more squarely before Your

2    Honor, but at least to the extent that it shows, you know, this

3    wasn't -- it wasn't as though John, you know, realized -- you

4    know, realizing that Lisa had gotten herself in a lot of hot

5    water, walked away and laid low.  His addiction didn't permit

6    for that.

7         So I guess at the end of the day, Your Honor, I know the

8    system we have is what we have and there are only so many tools

9    available, but I just think that it would be ultimately in

10   society's interests and in the interests of justice for Mr.

11   Gates to have a term of imprisonment that takes this all into

12   account rather than, you know, piecemeal, you know, punishments

13   based on basically the same saga of addiction.

14        THE COURT:  Uh-huh.  All right.  Thank you, Mr.

15   Maciolek.

16        Mr. Gates, you've got the right to address the Court before

17   I decide what sentence I should impose, so you don't have to say

18   anything, but I would be very eager to hear your perspective and

19   anything you think I should consider before I decide.  So go

20   ahead.

21        THE DEFENDANT:  I guess I'd just like to start by

22   apologizing to the Court and, well, to my family for the damage

23   that I've caused, my addiction.  Mr. Maciolek said he would hope

24   that Your Honor would consider my usage, my addiction to the

25   drug more so than the (inaudible) because I wasn't -- I don't

1    minimize my guilt.  I'm guilty; no doubt about that.  I was

2    trying to purchase methamphetamine.  I was -- played more of a

3    patsy than as a partner in any type of distribution, and I guess

4    I would just hope that Your Honor would see that or at least

5    part of that.

6              THE COURT:  Uh-huh.  All right.  Anything else?

7              THE DEFENDANT:  No.

8              THE COURT:  All right.  Well, I'll thank counsel for

9    their presentation of the case.  They both make good arguments,

10    all of which are worthy of consideration.

11         So I'll start with the pending charge in the

12    almost-completed state sentence here as well.  I will consider

13    those really -- although they're really not related charges

14    here, I do think that they do stem from the same saga of

15    addiction, and I think that the crime here is going to call for

16    a significant enough sentence that it's appropriate for me to

17    run the federal sentence concurrent to the almost completed --

18    whatever is left on the revocation sentence.  I think you're

19    finished up with that sentence on January 1st, so that's almost

20    inconsequential, but every day in prison is a bad day, so I will

21    run it concurrent with the remainder of that sentence, and I'll

22    also run it concurrent with whatever sentence you might get on

23    the possession charge in Wood County.  It's a relatively minor

24    drug possession charge, and I think that it would be appropriate

25    for you to finish your federal sentence and then come to federal

1    supervision and make a clean start, and so that's how we'll

2    handle that.  And I will consider -- in deciding what sentence I

3    should impose, I'll also consider the fact that you did end up

4    getting the 18-month sentence on the revocation sentence, so

5    there was a price to be paid for that too.

6        Now, I will say that it's an aggravating factor that you

7    committed the crime here while you were on supervision for a

8    previous conviction, so that is an aggravating factor.  You

9    don't have a really daunting criminal history.  I would describe

10   it as a relatively minor one, but the fact that you committed

11   this crime while you're on supervision for another one

12   demonstrates a kind of commitment to criminality.  I do think

13   that it's probably a fair thing to say that a lot of your

14   criminal activity here is driven by your addiction, but it's

15   also fair to say that you just weren't managing your addiction

16   very well, and the things that you did while you were in the

17   throes of your addiction were degrading to the community because

18   you were dealing methamphetamine.

19       When I look more deeply into your criminal history, there's

20   two things that stand out to me.  One, it starts relatively late

21   in life.  You know, you have no criminal history before 31.

22   That's kind of an unusual situation.  Normally I see criminal

23   history starting at a much younger age.  I do really think that

24   your addiction really got out of control, but also when I look

25   at your criminal history, I also see some really -- it's

1    charitable to call it irresponsible behavior.  I think it's

2    really dangerous behavior that you committed while you were

3    within the throes of your addiction, and so I think we have to

4    be honest here that your addiction is a serious one, it's

5    long-lasting, and it has led you to do some really dangerous and

6    destructive things.  So I think, frankly, it's an illness, but

7    it is your responsibility to manage your illness just like if

8    you had a contagious disease, you'd have a responsibility to the

9    people that are exposed to it, and so it is with your addiction

10    too.  I mean, you do things that are just really unhealthy for

11    yourself, clearly, but also really damaging to the community.

12    So your addiction really is a kind of a mitigating factor

13    because I think it really leads to your irresponsible and

14    impulsive behavior, but at the same time I think it doesn't

15    completely alleviate you from having responsibility for managing

16    it.

17         Now, when I look at the activity here, there's nothing in

18    the drug -- in the guideline calculation here that strikes me as

19    really fundamentally wrong-headed.  It isn't like we have the

20    career offender guideline, which can take sometimes a relatively

21    minor criminal history and amplify it into, you know, a 25 or

22    30-year sentence, so I don't see anything like that that's

23    really kind of off the beam in terms of what the guidelines tell

24    me to consider about coming up with a just sentence.  I don't

25    see anything fundamentally wrong with the guidelines, but I am

1  going to vary from the guidelines here because I think this is a

2  case in which I have to put Mr. Gates in his proper spot within

3  the conspiracy and within the range of drug defendants that I

4  see in the Court, and so to avoid unwarranted disparities

5  between Mr. Gates and others, I'm not going to sentence him

6  within the guideline, which I think is unduly harsh.  When I

7  look among the co-conspirators here, I do think that Ms.

8  Schlipper is right, that he is kind of somewhere between Soua

9  Khang and Meng Xiong, and the thing that I find aggravating

10  about his offense, although I accept Mr. Maciolek's explanation

11  that really this is sort of drug-seeking behavior ultimately,

12  it's all part of the saga of addiction, but some people don't go

13  in as deep when they're trying to serve their own needs for

14  controlled substances, and some people go further than others in

15  trying to serve their need for their own drug use.

16       And so Mr. Gates here was a relatively sophisticated

17  coordinator of purchases of methamphetamine at relatively high

18  levels.  I think it went far beyond what he was using on his

19  own.  Mr. Maciolek describes the activity in a way that seems

20  really pretty plausible, that it wasn't Mr. Gates' own

21  sophisticated drug trafficking organization as the way we might

22  normally conceive of it, but it was I think, honestly, the way

23  Mr. Maciolek describes it, sort of like a buying cooperative,

24  that he had other users that were relatively high-level users,

25  and they coordinated their purchases.  But, of course, they all

1    supported their purchases by selling to others, and so there's

2    no getting around it that Mr. Gates was a fairly sophisticated

3    player.  I disagree with his description that he really was a

4    patsy.  I think that he was in more control than that suggests,

5    and if we look at the amount of money that he was able to

6    promise Lisa Xiong and the amount of quantity that he intended

7    to possess, I think we're looking at drug trafficking at more

8    than just a pure street-level dealing, certainly no kingpin or

9    leader of a drug trafficking organization, but, you know, a step

10   up from pure retail dealing at a level that warrants a fairly

11   serious sentence.

12       But in consideration of the fact that he already got the

13   revocation sentence and his spot in the conspiracy, I think a

14   sentence of five years is appropriate, and so I will impose a

15   sentence of five years.  The federal sentence will begin today.

16   As I've already indicated, it will run concurrently with the

17   remainder of the revocation sentence, and I will also order that

18   the federal sentence should run concurrent with any sentence

19   that he might receive in the Wood County case, which is case

20   20-CF-31 [verbatim] that Mr. Maciolek describes.

21       That will be followed by a four-year period of supervised

22   release.  It's longer than the minimum because I think that what

23   we have here is a fairly intractable addiction problem.  I

24   appreciate that Mr. Gates has been sober since he's been

25   incarcerated.  I hope that Mr. Gates stays sober while he's in

1    prison.  I expect he'll be able to do that, but making that

2    transition between life in the institution and life in the

3    community and staying sober is sometimes a challenge, and so I

4    think a little bit longer period of supervised release is

5    appropriate.

6        I didn't get any objections to the conditions that were

7    proposed in the presentence report.  Those are conditions 1

8    through 16, I believe -- let me just confirm that -- yes, 1

9    through 16.  But let me check in with Mr. Maciolek to see if Mr.

10   Gates has any objections to the conditions of supervision and

11   whether he would like to have them read.

12           MR. MACIOLEK:  Your Honor, I'll go in reverse order.

13   We would waive the formal reading into the record of each and

14   every --

15           THE COURT:  Okay.

16           MR. MACIOLEK:  -- of the proposed conditions of

17   supervised release, and we don't have any objections to them as

18   proposed, but especially for Mr. Gates' benefit, I'd, you know,

19   point out that the Court is able to adjust those if, upon Mr.

20   Gates' release, some of them are not necessary or don't make

21   sense or would warrant adjustment.

22           THE COURT:  Absolutely, absolutely.  Okay.  So I won't

23   read them into the record, but the conditions 1 through 16 will

24   be imposed.  That includes the more or less standard conditions

25   here in the district as well as some special ones for you, Mr.

1    Gates.  I won't read them because that gets tedious.  You can go

2    over them in writing.  That's more productive.  The conditions

3    will also include the three additional mandatory conditions of

4    supervised release which are statutorily required, and that's

5    that you not commit any additional crimes, that you not use any

6    illegal controlled substances, and that you cooperate in

7    providing a DNA specimen.

8          I'll reiterate the point that Mr. Maciolek makes:  These

9    are the conditions that I think are appropriate when you begin

10   your supervision, but they can be adjusted, so if you want them

11   adjusted, you can petition the Court to reconsider some of those

12   conditions.  The government or the probation office can do the

13   same thing.  The other point I will make about supervision is

14   this, is that it's intended to help you.  It's really designed

15   to facilitate your lawful integration into the community.  If I

16   wanted to impose more sentencing time, I could do that right

17   now.  I don't.  And everybody who works in the probation office,

18   which in the federal system is really an arm of the court --

19   probation officers work for the court in the federal system,

20   unlike the state -- everyone here is really committed to helping

21   people succeed on supervision, so please embrace your

22   supervision, develop a good relationship with your supervising

23   officer.  If you're honest about your struggles, there's almost

24   nothing that we can't overcome without sending you back to

25   prison, but if you're dishonest and you resist your supervision,

1    at a certain point the role of the supervisor is not just to

2    help you but also to report violations.  They're obligated to do

3    that.  And so we would all regard it as a failure if you were

4    revoked and sent back to prison, but if -- it happens

5    occasionally, but it's really our objective that supervision is

6    designed to facilitate your success after your term of

7    imprisonment.  So that takes care of your supervision.

8         Let me make sure I cover the other formalities of the

9    sentence.  All right.  So we've got the term -- oh, also while

10   you're in custody, I will recommend that you be afforded

11   prerelease placement in a residential re-entry center with work

12   release privileges.  I recommend that you get a substance abuse

13   assessment and appropriate treatment, including an RDAP program

14   if you're eligible.  I really think that getting to the root of

15   your addiction will be useful.  Also, I'm going to recommend

16   that you get a mental health assessment and appropriate

17   treatment for that as well, and also I'll recommend that you

18   participate in vocational and educational programming while

19   you're incarcerated as well.

20        I do also have to impose the mandatory $100 criminal

21   assessment penalty, which is payable to the Clerk of Court

22   immediately after sentencing, and, Mr. Gates, I would encourage

23   you to get that paid.  If you leave it unpaid, it can interfere

24   with your ability to participate in programming at the Bureau of

25   Prisons, so don't let a hundred dollars stand in the way of

1    useful programming for you.

2        Drug testing is not waived.  It's addressed in Special

3    Condition No. 16.

4        The defendant does not have the means to pay a fine under

5    the principles in guideline Section 5E1.2(c) without impairing

6    his ability to support himself upon release from custody, so I

7    impose no fine.

8        The probation office is to notify local law enforcement

9    agencies and the state attorney general of the defendant's

10    release to the community.

11        Mr. Gates, you've got the right to appeal your conviction

12    if you think your plea was somehow unlawful or involuntary, and

13    you've got the right to appeal the sentence I've just imposed if

14    you think the sentence that I've imposed is unlawful in some

15    way.  But if you want to appeal, you've got to do it within the

16    deadlines, and that means you'd have to file a notice of appeal

17    within 14 days of entry of judgment in this case or within 14

18    days of any notice of appeal filed by the government if the

19    government were to appeal.  If you can't afford the filing fee

20    for the appeal, you can apply for leave to appeal *in forma*

21    *pauperis*, which just means without paying the filing fee, and if

22    you can't afford counsel to represent you in the appeal, you can

23    apply for counsel to be appointed at government expense.

24        I think I've covered everything that I need to, but let's

25    check in.  Ms. Schlipper, is there anything else you think I

1    need to address?

2            MS. SCHLIPPER:  Just the government moves to dismiss

3    Count 1 and 21 as they relate to Mr. Gates.

4            THE COURT:  That motion will be granted.  Counts 1 and

5    21 will be dismissed as they pertain to Mr. Gates.

6        Mr. Maciolek, anything else?

7            MR. MACIOLEK:  No, Your Honor.  Thank you.

8            THE COURT:  Ms. Sheets, did I miss anything?

9            OFFICER SHEETS:  No, Your Honor.

10           THE COURT:  Thank you, all.

11       Good luck, Mr. Gates.

12       (Proceedings concluded at 2:03 p.m.)

13                              ***

14

15

16

17

18

19

20

21

22

23

24

25

1     I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2     Reporter in and for the State of Wisconsin, certify that the

3     foregoing is a true and accurate record of the proceedings held

4     on the 22nd day of December, 2020, before the Honorable

5     James D. Peterson, Chief U.S. District Judge for the Western

6     District of Wisconsin, in my presence and reduced to writing in

7     accordance with my stenographic notes made at said time and

8     place.

9          Dated this 19th day of January, 2021.

10

11

12

13

14

15                         /s/ Jennifer L. Dobbratz

16                    Jennifer L. Dobbratz, RMR, CRR, CRC
                              Federal Court Reporter
17

18

19

20

21

22

23

24    The foregoing certification of this transcript does not apply to
      any reproduction of the same by any means unless under the
25    direct control and/or direction of the certifying reporter.